UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

V. C.R. 05-48-1 T

JARRETT FALCIONE

**MOTION FOR DOWNWARD DEPARTURE**

Now comes the Defendant, Jarrett Falcione ("Falcione"), and respectfully requests this honorable Court grant a downward departure from the applicable advisory sentencing range of the United States Sentencing Guidelines.

The grounds for this Motion are contained in the accompanying Memorandum.

Respectfully submitted,

JARRETT FALCIONE
By his attorney

ANDREW BERG Bar No. 4754
Sammartino & Berg LLP
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-0113
(401) 274-0175

**CERTIFICATION OF SERVICE**

I hereby certify that on the 31st day of August 2005, a true copy of the above Motion was mailed to Assistant U.S. Attorney James H. Leavey, Office of the United States Attorney, 50 Kennedy Plaza, Fleet Center, 8th Floor, Providence, RI 02903 and Michael Perry, United States Probation, 36 Exchange Terrance, 3rd Floor, Providence, RI 02903.

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

V. C.R. 05-48-1 T

JARRETT FALCIONE

**MEMORANDUM IN SUPPORT OF MOTION FOR DOWNWARD DEPARTURE**

For the following grounds, Defendant, Jarrett Falcione ("Falcione") requests this Court grant his Motion For Downward Departure.

**Relevant Facts**

On March 26, 2005, Falcione, along with two co-defendants, Sean Philbrook and Antoinette DeLuca, participated in the robbery of a Citizens Bank branch located in a Stop and Shop store in Pawtucket. During the robbery, Philbrook handed a note to a teller demanding money. Falcione and DeLuca assisted in the planning and execution of the robbery.

On June 16, 2005, Falcione pled guilty to the above-entitled indictment charging him with one count of bank robbery. On August 19, 2005 the Office of the Probation Officer for the United States District Court ("Probation") produced its Presentence Report ("PSR"), outlining its determination of Falcione's offense level and criminal history under the United States Sentencing Guidelines ("USSG" or "Guidelines").

Based on a finding of two prior felony drug trafficking offenses, Probation determined that Falcione is a Career Offender under USSG §4B1.1. PSR, ¶22, 28, 33. Accordingly, his offense level was increased from 22 to 29. Applying a criminal history category of VI, the finding of Career Offender status resulted in an increase in the sentencing range from 84 to 105 months, to 151 to 188 months. PSR ¶36, 59.

**Argument**

Falcione asserts that his designation as a career offender is not consistent with the purposes of the Career Offender provisions, and thus, should not be applied.

Essentially, USSG §4B1.1 provides that a defendant with two prior convictions for crimes of violence or drug trafficking offenses should be sentenced at a significantly higher offense level, and under the maximum criminal history category. In promulgating §4B1.1, the United States Sentencing Commission ("the Commission") noted that Career Offender status is reserved for "the **class of recidivist offenders** for whom a lengthy term of imprisonment is appropriate[.]" USSG §4B1.1, *Background* [emphasis added]. As indicated by the above-emphasized language, the original goal of the Career Offender provision was to incapacitate offenders with a high risk of recidivism.

However, recently, the Commission made findings that in the case of street level drug dealers, Career Offender status does not serve its intended purpose. In November of 2004, the Commission published a report entitled Fifteen Years of Guidelines Sentencing, which considered statistical information and other evidence, with the purpose of examining the effectiveness of the Guidelines in meeting its goals and directives ("the Report").[1] In considering the facts surrounding the application of the Career Offender provision[2], the Commission concluded as follows:

> "The question for policymakers is whether the career offender guideline, especially as it applies to repeat drug traffickers, clearly promotes an important purpose of sentencing. Unlike repeat violent offenders, whose incapacitation may protect the

[1] Cited portions of the Report are attached to this Memorandum. The entire Report is available at the following internet web site: http://www.ussc.gov/15_year/15year.htm

[2] Although the Commission was examining the Career Offender provision in the context of racial disparities in sentencing, the observations and conclusions of the Commission are not tied to race.

> public from additional crimes by the offender, criminologists and law enforcement officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high. Incapacitating a low-level drug seller prevents little, if any, drug selling; the crime is simply committed by someone else.
>
> Most importantly, preliminary analysis of the recidivism rates of drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates are much lower than other offenders who are assigned to criminal history category VI. The overall rate of recidivism for category VI offenders two years after release is 55 percent (USSG, 2004). The rate for offenders qualifying for the career criminal guideline based on one or more violent offenses is about 52 percent. But the rate for offenders qualifying only on the basis of prior drug offenses is only 27 percent. The recidivism rate for career offenders more closely resembles the rates for offenders in the lower criminal history categories in which they *would be* placed under the normal criminal history scoring rules in Chapter Four of the *Guidelines Manual.* The career offender guideline thus makes the criminal history category a less perfect measure of recidivism risk than it would be without the inclusion of offenders qualifying only because of prior drug offenses."

Fifteen Years of Guidelines Sentencing, p. 134 (attached).

Thus, the writers of the Guidelines, looking back at the actual application of the Career Offender provision, have concluded that its application to defendants with street level drug offenses as predicates does not serve the section's intended purpose.

In the instant case, the two offenses that Probation cites as the basis of its conclusion that Falcione is a Career Offender are low level drug trafficking violations. Based on this finding, Falcione's sentencing range has jumped from approximately 7 - 8.75 years to 12.5 - 15 2/3 years; nearly double. However, in light of the fact that Falcione's criminal history is comprised of low level drug offenses, sentencing him as a Career Offender would result in a disproportionately high sentence, inconsistent with the goal of the Guidelines as indicated by the Commission.

Accordingly, Falcione is requesting this Court exercise its discretion, and not apply the Career Offender designation in fashioning its sentence. Falcione will still be

subjected to an appropriately lengthy sentence, but one that is consistent with the goals of the Guidelines.

Respectfully submitted,

JARRETT FALCIONE
By his attorney

ANDREW BERG Bar No. 4754
Sammartino & Berg LLP
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-0113
(401) 274-0175

**CERTIFICATION OF SERVICE**

I hereby certify that on the 31st day of August 2005, a true copy of the above Memorandum was mailed to Assistant U.S. Attorney James H. Leavey, Office of the United States Attorney, 50 Kennedy Plaza, Fleet Center, 8th Floor, Providence, RI 02903 and Michael Perry, United States Probation, 36 Exchange Terrance, 3rd Floor, Providence, RI 02903.

# FIFTEEN YEARS OF GUIDELINES SENTENCING

## An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform

UNITED STATES SENTENCING COMMISSION

November 2004

*Submitted to*

**Ricardo H. Hinojosa**
*Chair*

**Ruben Castillo**
*Vice Chair*

**William K. Sessions, III**
*Vice Chair*

**John R. Steer**
*Vice Chair*

**Michael E. Horowitz**
*Commissioner*

**Michael E. O'Neill**
*Commissioner*

**Deborah Rhodes**
*(ex officio)*

**Edward F. Reilly, Jr.**
*(ex officio)*

*Prepared by*

**Paul J. Hofer**
**Charles Loeffler**
**Kevin Blackwell**
**Patricia Valentino**

**Figure 4.10: Estimated Time Served 1984-2002 with Projections for Recommended Ratio**




## 2. *Using Prior Drug Trafficking Convictions to Define Career Offenders.*

The SRA directs the Commission to "assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized by statute" for offenders who are at least 18 years old and who have been convicted of a crime of violence or a drug trafficking offense, and who previously have been convicted of two or more such offenses. The Commission implemented this directive by creating USSG §4B1.1, the "career offender" guideline. It places each offender with three violent or drug trafficking convictions in the highest criminal history category VI, and sets the offense level at the guideline range associated with the statutory maximum penalty for the offense.

In 2000, there were 1,279 offenders subject to the career offender provisions, which resulted in some of the most severe penalties imposed under the guidelines. Although Black offenders constituted just 26 percent of the offenders sentenced under the guidelines in 2000, they were 58 percent of the offenders subject to the severe penalties required by the career offender guideline. Most of these offenders were subject to the guideline because of the inclusion of drug trafficking crimes in the criteria qualifying offenders for the guideline. ( Interestingly, Hispanic offenders, while

representing 39 percent of the criminal docket, represent just 17 percent of the offenders subject to the career offender guideline.) Commentators have noted the relative ease of detecting and prosecuting offenses that take place in open-air drug markets, which are most often found in impoverished minority neighborhoods (Tonry, 1995), which suggests that African-Americans have a higher risk of conviction for a drug trafficking crime than do similar White drug traffickers (Tonry, 1995; Blumstein, 2000).

The question for policymakers is whether the career offender guideline, especially as it applies to repeat drug traffickers, clearly promotes an important purpose of sentencing. Unlike repeat violent offenders, whose incapacitation may protect the public from additional crimes by the offender, criminologists and law enforcement officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high. Incapacitating a low-level drug seller prevents little, if any, drug selling; the crime is simply committed by someone else.

Most importantly, preliminary analysis of the recidivism rates of drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates are much lower than other offenders who are assigned to criminal history category VI. The overall rate of recidivism for category VI offenders two years after release from prison is 55 percent (USSC, 2004). The rate for offenders qualifying for the career criminal guideline based on one or more violent offenses is about 52 percent. But the rate for offenders qualifying only on the basis of prior drug offenses is only 27 percent. The recidivism rate for career offenders more closely resembles the rates for offenders in the lower criminal history categories in which they *would be* placed under the normal criminal history scoring rules in Chapter Four of the *Guidelines Manual.* The career offender guideline thus makes the criminal history category a *less* perfect measure of recidivism risk than it would be without the inclusion of offenders qualifying only because of prior drug offenses.

There may be other rules that have unwarranted adverse impacts on minority groups without clearly advancing a purpose of sentencing. The use of some non-moving traffic violations in the calculation of the criminal history score is one such possibility but there are many others (Blackwell, 2003). Continued research on how well different rules that result in adverse impacts are fulfilling the purposes of sentencing will improve both the fairness and the effectiveness of federal sentencing.

# E. Conclusion

The federal criminal justice system must be both fair and perceived to be fair. A central aspect of fairness in America's multi-racial and multi-ethnic society is equal treatment under law, without regard to race, ethnicity, or gender. America's special concern with racial justice helped lead to the creation of a sentencing system based on racially neutral rules. Evaluating the success of this system at eliminating any vestige of discrimination must be a central component of evaluating the guidelines.

For these reasons, it is troubling that reports of continuing racial, ethnic, and gender discrimination continue to appear in newspaper stories and in academic journals. Such reports understandably undermine public confidence in the federal courts, particularly among minority groups. Public confidence also is threatened by data showing that the gap in average sentences between African-American and other offender groups grew wider in the years following implementation of the guidelines and mandatory minimum penalty statutes enacted shortly after passage of the SRA. These findings deserve the careful attention of policymakers.

To be useful to policymakers, evidence of continuing sentencing disparities must be both accurate and informative concerning *how* and *where* in the criminal justice process disparities arise, and whether they are justified by differences in the seriousness of the offenses committed by the members of each group or by other case characteristics that are important to achieving the purposes of law enforcement. The review of evidence in this chapter suggests that the importance of discrimination by judges has been exaggerated by the existing research, while other stages of the criminal justice process have been relatively neglected, in part because of the paucity of data that can be used to investigate them.

The evidence shows that if unfairness continues in the federal sentencing process, it is more an "institutionalized unfairness" (Zatz, 1987; Tonry, 1996) built into the sentencing rules themselves rather than a product of racial stereotypes, prejudice, or other forms of discrimination on the part of judges. Most of the difference between the average sentences of Blacks, Whites, and Hispanics is an impact of the offense and offender characteristics that have been made relevant to sentencing by the guidelines and the mandatory minimum penalty statutes.

Despite the Commission's efforts to equalize the treatment of certain crimes, such "white collar" and "street" crimes involving similar economic harms, increasingly severe treatment of other crimes, particularly drug offenses and repeat offenses, has widened the gap among different offender groups. Today's sentencing policies, crystalized into the sentencing guidelines and mandatory minimum statutes, have a greater adverse impact on Black offenders than did the factors taken into account by judges in the discretionary system in place immediately prior to guidelines implementation. Attention might fruitfully be turned to asking whether these new policies are necessary to achieve any legitimate purpose of sentencing.